E-FILED
Monday, 09 June, 2008 09:16:06 AM
Clerk, U.S. District Court, ILCD

# United States District Court

CENTRAL  DISTRICT OF  ILLINOIS

UNITED STATES OF AMERICA

v.

KELLY A. GALLAGHER

**CRIMINAL COMPLAINT**

CASE NUMBER: 08-mj-7225

FILED
JUN 0 6 2008
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __January 9, 2008, to the present,__ in __Macon__ County, in the __Central__ District of __Illinois__ defendant(s) did:

knowingly distribute cocaine, a Schedule II controlled substance, and possess cocaine with the intent to distribute it,

in violation of Title __21__ United States Code, Section(s) __841(a)(1) and (b)(1)(C)__

I further state that I am a(n) __DEA Special Agent__ and that this complaint is based on the following facts:
          Official Title

See attached affidavit

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__June 6, 2008__                  at   __Urbana, Illinois__
Date                                       City and State

David G. Bernthal
U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS       )
                        ) ss
COUNTY OF MACON         )

## AFFIDAVIT

Richard Dollus, being first duly sworn on oath, hereby deposes and states as follows:

1.  I am a Special Agent with the Drug Enforcement Administration (DEA) currently assigned to the Springfield, Illinois Resident Office. I have been employed with the DEA since June 1999. Prior to my employment with the DEA, I was employed as a Police Officer with the City of Belleville, Illinois for approximately 5 years. I attended the DEA Basic Agent training in Quantico, Virginia. During that period of time, I was trained in the investigation of controlled substances under federal law, including but not limited to drug identification, writing reports, court testimony, tactical operations and defensive tactics, evidence collection, and undercover operations. I have also attended numerous schools, training and seminars relating to the investigation of narcotics traffickers and money laundering. Since my time of employment with the DEA, I have personally initiated, investigated, and participated in numerous narcotics investigations leading to the arrest and prosecution of individuals under investigation for violations of federal narcotics laws, including the seizure and forfeiture of assets from drug proceeds. I have also participated in the execution of numerous search and arrest warrants and been involved in federal investigations involving the interception of wire communications which have resulted in the arrest and conviction of drug violators.

2.  The statements contained in this affidavit are based in part on my own personal observations, information provided by other DEA agents and other law enforcement officers, information provided by other witnesses, and my experience and background as a law

enforcement officer. The information contained in this affidavit is not an exhaustive account of everything I know about this case. Rather, it is only the facts that I believe are necessary to establish probable cause.

3. This affidavit is submitted in support of a complaint charging Kelly A. Gallagher with distribution and possession of cocaine with the intent to distribute it, in violation of Title 21, United States Code, Section 841(a)(1).

4. Affiant and members of the DEA, Springfield Resident Office ("Springfield RO") and Narcotics Detectives from the Decatur Police Department initiated a cocaine investigation in December 2007, involving a subject identified as Dana Hawkins who resides in Decatur, Illinois.

5. In December 2007, the Decatur Police Department developed a Confidential Source ("CS #1"), who provided information and intelligence relating to the drug trafficking activities of Dana Hawkins and others in the Decatur, Illinois area. CS #1 is cooperating in hopes to receive some type of benefit on a pending state drug case which has not yet been formally charged.

6. CS #1 has felony convictions for possession of a controlled substance, criminal damage to property, and aggravated battery, and convictions for criminal trespass and criminal damage to property that may or may not be a misdemeanor. CS #1 is currently on probation for the aggravated battery and criminal trespass conviction in Macon County, Illinois. CS #1 currently has an arrest warrant from Boone County, Missouri for delivery, manufacture, produce, or attempt to, or possess with intent to distribute a controlled substance. This warrant is nonextraditable in Illinois. CS #1 also has pending charges in Macon County for criminal damage to property under $300 and possession of 2.5-10 grams of cannabis.

7. During an initial debriefing, CS #1 advised that Dana Hawkins obtained kilogram quantities of cocaine in Chicago, Illinois and distributed quarter kilogram quantities in Decatur, Illinois. CS #1 stated that Hawkins transported large quantities of United States currency to Chicago, Illinois for the purchase of cocaine. CS #1 stated that he/she had observed Dana Hawkins give large sums of money to his Chicago source of supply identified by CS #1 as Djuan Davis. CS #1 stated that it was his/her belief that Djuan Davis would then meet with his source of supply to obtain the cocaine on behalf of Dana Hawkins. CS #1 further stated that he/she believed that Jessie Traylor, Jerome Walker, and others, would transport the cocaine from Chicago to Decatur Illinois utilizing the Greyhound Bus system.

8. CS #1 advised that he/she had observed Kelly Gallagher who resides in Decatur, Illinois obtain large quantities of cocaine from Dana Hawkins on consignment.

9. Decatur Police Department Detective David Dailey has been able to substantially corroborate the information supplied by CS #1, and believes CS #1 to be a reliable source of information. All of the basic information provided by CS #1 concerning criminal activity by Dana Hawkins and others has been shown to be truthful, and none has been shown to be false. However, during the course of this investigation, information has been received that CS #1 is obtaining cocaine directly from Dana Hawkins without the direction, supervision, or authorization of law enforcement officers.

10. On January 9, 2008, under the direction of Detective David Dailey, CS #1 was fitted with an audio recording device and met with Kelly Gallagher at a car wash in Decatur, Illinois. The conversation between CS #1 and Kelly Gallagher was monitored by myself and other law enforcement agents. The following is a summary of that conversation:

Kelly Gallagher told CS #1 that he hadn't worked in two years and was having a hard time getting a job. Gallagher stated "I got some money put, because I sold the bar. I can live for a long time doing what I'm doing, but I'm bored. I'm tired of the same, because I don't deal with too many people." Gallagher further stated, "I grab a couple of singles here and there, and woo woo you know. Stealth mode."

11.     Based on my training, experience, and context of the above conversation I believe Gallagher was stating that he obtained and distributed cocaine to a small number of individuals.

"I wish you had a couple of them, I'd take a couple of them." CS #1 advised Gallagher that it has been "dry" (a term commonly used and known by law enforcement to indicate the unavailability of cocaine). CS#1 discussed with Gallagher that he/she did not have any cocaine to which Gallagher replied that he was getting "$1,200 for a single." CS #1 told Gallagher that every time we get dry, I say I should put some back then I need "coke." Gallagher told CS#1 that "you don't want to hold it no where. I be putting it in the safe now and again, here and there… putting it up. Then I get thinking, what the fuck happens if something happens. Then you don't want to leave that… I would rather have money laying there than that shit…..that nine ounces."

CS #1 stated to Gallagher that "Dana could probably get some right now." Gallagher advised CS #1 that he had tried and could not. Gallagher told CS#1 that he had "good money now, bird money." (Bird money is a term known by law enforcement to mean one kilogram of cocaine.) Gallagher told CS #1, "I told him I'll give 24 for one of them." CS #1 stated, "he ain't go?" Gallagher stated to CS #1 that "he knew I got it." "The money I was putting out there. He said it's dry, dry up there too."

12.     Based on my training, experience, and context of the above conversation, I believe Gallagher stated that he distributed an ounce of cocaine for $1,200 and had obtained nine ounce quantities of cocaine, and that Gallagher had recently attempted to obtain cocaine from Dana Hawkins.

13.     On March 13, 2008, at approximately 6:13 p.m., Detective Dailey directed CS #1 to make a recorded telephone call to Kelly Gallagher at 217-917-1102 to obtain intelligence regarding Gallagher's drug trafficking activities. During the course of the conversation, Gallagher advised CS #1 that he did not have cocaine and that he had to "wait until he gets out of class," "he said he is good though." Gallagher advised CS #1 that he would be available at "8:00

or 8:30, when he gets out of class." CS #1 and Gallagher agreed to meet later that evening. CS #1 stated that Gallagher is referring to Dana Hawkins as "he" and that the "class" is a mandatory parole class that Dana Hawkins attends.

14. At approximately 7:50 p.m., surveillance agents observed Dana Hawkins travel to his known residence of                                   , Decatur. At approximately 8:01 p.m., Decatur Police Department Detective Hughes observed Gallagher arrive at the residence in a gold-colored Yukon. Detective Hughes observed Gallagher exit his vehicle and walk up to the porch. At approximately 8:19 p.m., Detective Hughes observed Gallagher depart Hawkins' residence followed by surveillance agents.

15. At approximately 8:33 p.m., Detective Dailey requested that CS #1 make a recorded telephone call to Kelly Gallagher at 217-917-1102. During the conversation, Detective Dailey heard Gallagher state to CS #1 that "...I'm getting ready to go and, uh, get into a kitchen somewhere here in a minute. I got to get something together and then I got to go." Gallagher advised CS#1 that he would call when he was on his way.

16. Based on my training and experience, I believe that Gallagher was stating to CS#1 that he was weighing and packaging cocaine for redistribution. CS #1 advised agents that he/she also believed that Gallagher was going to add a cutting agent to the cocaine, weigh, and package the cocaine for resale.

17. At that time, officers of the Decatur Police Department and the DEA met with CS #1 to formulate a plan for a recorded meeting with Kelly Gallagher. Detective Dailey searched CS #1's vehicle for contraband with negative results. I searched CS #1 for contraband with negative results. At that time, CS#1 was fitted with a video and audio recorder.

18. At approximately 9:16 p.m., CS #1 received an incoming call from Kelly Gallagher (217-971-1102). Gallagher advised CS#1 to meet him at "Riverside by St. Mary's" and then sent the address of                 to CS#1 via text message.

19. At approximately 9:24 p.m., CS #1 departed the prearranged location followed by law enforcement agents. At approximately 9:31 p.m., officers observed CS #1 arrive at                 as instructed by Gallagher. Officers observed Gallagher exit the residence and walk up to CS #1's vehicle.

20. Officers also observed an unknown male subject walk to CS #1's vehicle during the conversation between CS #1 and Gallagher. Agents monitoring the conversation between CS#1 and Gallagher could hear Gallagher discuss his drug trafficking activities with CS#1. Specifically, agents heard Gallagher state the following:

> "I'm rocking this shit for this cat then I'm going home." Gallagher stated that "he gave me six of them." Gallagher then talked about an unknown female subject. Gallagher stated, "the only reason I'm fucking with that girl is because she brings me money…. She was making me some paper, dog… I'm charging her $600, $700 a half." Gallagher further stated, "I'm going to do what I know how to do… put that paper up… no… if it takes me four, five months I'm going to have $40,000 put up." "I'm going on the highway and find a real connect…a real fucking connect. I'm not going to this bullshit $36,000…."
>
> CS #1 stated "he killing you man." Gallagher stated "I know he is." CS #1 stated "$36,000, I know he is he is probably giving you at least eight a piece." Gallagher stated, "He charging me a thousand a piece." CS #1 stated, "I told you he ain't giving me no eight a piece, dude is crazy." Gallagher stated, "He is but he fucks you on the back end by making you ride him places and do…" C S #1 stated "When you going to take over… driving Mr. Daisy. He was mad at you…. he was pissed." GALLAGHER stated, "I know, when he threw that shit at me that day."
>
> Gallagher stated, "How I can not make money and you make money… I just can't stop doing…so I can chill with you when you ain't paying for shit for me. You ain't paying for the ride for me." Gallagher further stated, "Dude did not pay for the ride for me for over a year." GALLAGHER stated, "those rides were for free." CS #1 stated, "He played me like that a couple of times, then he started buying me shoes." GALLAGHER stated, "He didn't buy me shit and still got to pay that

bill." CS #1 stated, "that's because he knows I don't have anything and you do." Gallagher stated "That's what it's about…I want to be a regular Joe…don't let someone count my paper…and not let them know what I got… so I can get the most for the little." Gallagher stated, "I ain't mad at dude you know what I'm saying…. I'm going to make him his money and make my money till I get forty." Gallagher then talks about taking $40,000 to Tennessee and obtaining another cocaine source. During the conversation CS #1 asked, "What Dana going to do?" Gallagher then talked about how he and CS #1 make money for Hawkins. Gallagher also talked about the police not finding Djuan DAVIS' fingerprints on the cocaine.

21.     On January 30, 2008, CS #1 contacted Detective Dailey and indicated he/she and Hawkins were in Chicago, Illinois. CS #1 advised that he/she overheard a telephone call between Hawkins and an unknown subject. CS #1 stated that the conversation on the telephone indicated that "Jessie" was transporting cocaine to Decatur, Illinois on the Greyhound bus and that Kelly Gallagher would pick "Jessie" up at the bus station.

22.     Based on CS #1's information, Detective Dailey and other Decatur Police Detectives initiated surveillance at the Greyhound bus stop which is located at Sandy's Motel (1675 East Pershing, Decatur, Illinois). Surveillance officers observed an individual known to officers as Kelly Gallagher arrive at the bus stop. Detective Dailey observed an unknown black male subject carrying a small backpack exit the waiting room and enter Gallagher's vehicle. The surveillance team followed Gallagher and the unknown subject to the Best Value Inn located at 450 East Pershing, Decatur, Illinois. The surveillance team observed Gallagher and the unknown male enter the lobby of the hotel. After a short period of time, the surveillance team observed the unknown male subject enter room 200 and Gallagher leave the hotel.

23.     I served an Administrative Subpoena requesting hotel room records for the date of January 30, 2008 and I discovered that on January 30, 2008, Jessie Lee Traylor rented Room 200 at the Best Value Inn. Traylor provided an Illinois ID card as identification when renting the

room and a photocopy of Traylor's ID was attached to the registration card. Traylor listed 2710 South State Street, Chicago, Illinois as an address.

24. On May 13, 2008 the Honorable Michael P. McCuskey, Chief United States District Court Judge for the Central District of Illinois, signed an order authorizing the interception of wire communications for telephone (217)201-1065. Telephone (217)201-1065 was subscribed to by Dana Hawkins. The telephone is being utilized by Dana Hawkins.

25. On May 27, 2008, at approximately 5:38 p.m., a call was intercepted between Dana Hawkins and Kelly Gallagher. During the conversation Hawkins advised that he was in Chicago, Illinois and would return the next day. Hawkins further advised Gallagher, "We should be all good too." Based on my training and experience, I believe the above conversation indicated that Hawkins was going to provide Gallagher with cocaine for distribution.

26. On May 28, 2008, at approximately 1:48 p.m., a call was intercepted between Hawkins and Kelly Gallagher. During the conversation Gallagher advised that he was on his way to Hawkins's residence.

27. At 1:50 p.m, surveillance officers observed Kelly Gallagher and Mike Stanley arrive at                    , Decatur, Illinois (Dana Hawkins's residence). Surveillance officers observed both subjects exit Gallagher's Yukon and walk toward the back of the residence. After approximately 15 minutes of surveillance, officers observed Mike Stanley and Gallagher depart from the residence in Gallagher's Yukon, driven by Mike Stanley. A traffic stop was conducted on the Yukon and uniformed officers made contact with Mike Stanley and Kelly Gallagher. Gallagher was arrested for an outstanding warrant relating to a traffic offense and was immediately transported from the area. A K-9 conducted a free air sniff of the exterior of the

Yukon. The K-9 alerted to the presence of narcotics. Mike Stanley exited the Yukon and was detained while officers conducted a search of the Yukon pursuant to the K-9 alert.

28. A search of the vehicle revealed a zip-lock plastic bag containing another zip-lock plastic bag containing a white chunky powder substance (apparent cocaine) hidden under the seat occupied by Kelly Gallagher. United States currency was also located with the apparent cocaine. At that time, officers seized the cocaine without notice to or observation by Gallagher and Mike Stanley. TFA Sean Simpson later field tested the white chunky substance for the presence of cocaine. The substance tested positive. The apparent cocaine weighed approximately 288 grams with packaging.

29. The following is a summary of selected phone calls as a result of the traffic stop and Gallagher and Stanley's confusion regarding the whereabouts of the seized cocaine.

30. On May 28, 2008 calls were intercepted between Kelly Gallagher and Dana Hawkins. During the conversations, Gallagher advised Hawkins that he was taken from the traffic stop and that the police did not search the vehicle in front of him. Hawkins was upset about the situation and questioned Gallagher about the missing cocaine. Hawkins asked Gallagher about Mike Stanley possibly taking the cocaine, which Gallagher responded that he didn't believe that Stanley had taken the cocaine. Gallagher could not believe that the police officer would have just taken the cocaine without arresting him. Gallagher confirmed to Hawkins that the cocaine (which officers believed he had just received from Hawkins) was hidden under the seat of the vehicle.

Further, affiant sayeth not.

                                            s/Richard Dollus
                                            Richard Dollus, DEA Special Agent
                                            Drug Enforcement Administration

Subscribed and sworn to before me this 6th day of June, 2008.

s/David G. Bernthal

DAVID G. BERNTHAL
UNITED STATES MAGISTRATE JUDGE